PRIMA TEK II, L.L.C., Highland Supply Corporation, Highland Manufacturing and Sales Company and Prima Tek I, Plaintiffs–Appellees,

v.

A–ROO COMPANY (an Ohio Corporation) and A–Roo Company (a Texas Corporation), Defendants–Appellants.

No. 99–1581.

United States Court of Appeals, Federal Circuit.

Aug. 17, 2000.

Joseph P. Titterington, Dunlap, Codding & Rogers, P.C., of Oklahoma City, Oklahoma, argued for plaintiffs-appellees.

Jay R. Campbell, Renner, Otto, Boisselle & Sklar, P.L.L., of Cleveland, Ohio, argued for defendants-appellants. With him on the brief was Gordon D. Kinder.

Before MAYER, Chief Judge, CLEVENGER and GAJARSA, Circuit Judges.

CLEVENGER, Circuit Judge.

This appeal arose from a patent infringement suit brought by Prima Tek II, L.L.C., Highland Supply Corp., Highland Manufacturing and Sales Co., and Prima Tek I, L.L.C., against A–Roo Co. of Ohio and A–Roo Co. of Texas. Appellants A–Roo Co. of Ohio and A–Roo Co. of Texas appeal from the judgment of the United States District Court for the Southern District of Illinois, declaring the case to be exceptional under 35 U.S.C. § 285 due to litigation misconduct, and awarding attorney fees to Appellees. *See Prima Tek II, LLC v. A–Roo Co.,* No. 97–869–DRH (S.D.Ill. Mar. 16, 1999) (Order). On appeal, Appellants argue that Appellees, all of whom are licensees of the patents in suit, lacked standing to sue for patent infringement in the district court without being joined by the patent owner, Southpac International, Inc. Because we agree that Appellees lacked standing to maintain an infringement suit in their own names, we reverse the decision of the district court awarding attorney fees to Appellees.

I

Appellees are licensees of six U.S. patents ("the patents") relating to decorative flower pot sleeves.[1] The patents are owned by Southpac International, Inc. ("Southpac"), a Cook Islands corporation. In 1995, Southpac entered into a license agreement with Prima Tek I, L.L.C. ("Prima Tek I"), granting to Prima Tek I the exclusive, worldwide right to make, use and sell the products and processes covered by the patents, but only to the extent necessary to grant a license to Prima Tek II, L.L.C. ("Prima Tek II"), to allow *Prima Tek II* to make, use and sell the patented products and processes. The agreement contained a termination clause whereby the license automatically terminated at the end of an initial two-year term, or at the end of each year thereafter, unless Southpac notified Prima Tek I at least 30 days in advance of its intent to renew the agreement for an additional year. The agreement also included an enforcement clause providing that Prima Tek I "shall have the sole and exclusive right to sue third parties for infringement ... and

---

1. U.S. Patent Nos. 5,581,938, 5,617,703, 5,687,845, 5,740,657, 5,740,658, and 5,758,-472.

to collect damages for past infringements." Finally, the agreement stated that Southpac "shall be bound by any judgment which may be rendered in any ... suit with respect to validity, infringement and enforceability of any of the Licensed Patents."

Prima Tek I, itself unable to make, use or sell any products or processes covered by the patents, subsequently transferred those exclusive worldwide rights to Prima Tek II. The agreement between Prima Tek I and Prima Tek II included the same termination and enforcement clauses as the license from Southpac to Prima Tek I; however, it did not contain a provision that Prima Tek I would be bound by any judgment rendered against Prima Tek II. Prima Tek II subsequently licensed to Highland Supply Corp. ("HSC") and Highland Manufacturing and Sales Co. ("HMSC") the right to make, use and sell patented products in the United States, Canada and Mexico. These licenses were subject to the right of Prima Tek II to grant additional licenses in the same territory in exchange for partial royalty payments to HSC and HMSC.

A–Roo Co. of Ohio and A–Roo Co. of Texas (collectively "A–Roo") manufactured and sold various plant sleeve covers and flower pot containers in the United States. Appellees Prima Tek II, HSC, and HMSC ("the original plaintiffs") brought suit against A–Roo in October 1997, alleging infringement of two of the six patents licensed to them by Southpac. The four remaining patents were later added to the suit on A–Roo's motion.

A–Roo asserted several counterclaims, including an allegation that the patents were unenforceable due to inequitable conduct. Initially, A–Roo based its inequitable conduct counterclaim on the purported failure of the applicant, Mr. Weder, to disclose relevant prior art to the U.S. Patent and Trademark Office ("PTO") during

prosecution of the patents in suit. Later, A–Roo abandoned this position, claiming that it had mistakenly relied on a copy of the file history that contained a PTO printing error. Thereafter, A–Roo filed an amended answer and counterclaim, alleging that Mr. Weder had intentionally failed to make other required disclosures during prosecution of the patents in suit. The original plaintiffs moved for summary judgment on A–Roo's counterclaims, which the district court granted.

A–Roo also filed two motions to dismiss the suit for lack of standing. First, A–Roo asked that the case be dismissed because the original plaintiffs lacked standing to sue for patent infringement in their own names without joining the patent owner. Second, A–Roo argued that neither HSC nor HMSC had any right to participate as co-plaintiffs because they were bare licensees, rather than exclusive licensees, of the patents in suit.

The district court denied A–Roo's motions to dismiss. First, the court held that Southpac was not a necessary party because it had assigned all substantial rights in the patents to Prima Tek I. Second, the district court rejected A–Roo's argument that HSC and HMSC were bare licensees and therefore had no right to participate in the case. The court concluded that the agreements between Prima Tek II and HSC and HMSC transferred sufficient rights in the patents to give HSC and HMSC standing to sue on their own behalf.

Although the district court rejected both of A–Roo's standing arguments, the court held *sua sponte* that Prima Tek I was a "necessary party" to the patent infringement suit because the agreement between Prima Tek I and Prima Tek II did not contain a provision, as did the agreement between Southpac and Prima Tek I, that Prima Tek I would be bound by any judgment rendered against Prima Tek II. For

this reason, the district court ordered Prima Tek I joined as an involuntary plaintiff. *See Prima Tek II, LLC v. A–Roo Co.*, No. 97–869–DRH, slip op. at 4 (S.D.Ill. Jan. 7, 1999) (Order) (citing *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132, 33 USPQ2d 1771, 1776 (Fed.Cir.1995); *Independent Wireless Telegraph Co. v. Radio Corp. of Am.*, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926)).

Shortly before trial, A–Roo filed a motion for judgment in which it conceded infringement of the patents in suit, agreed that the patents were not invalid, and agreed to a permanent injunction prohibiting it from manufacturing, selling, or using any infringing products. A–Roo's motion was granted and the district court's final decree entered on January 11, 1999.

Following entry of the final decree, Appellees moved to have the case declared exceptional under 35 U.S.C. § 285, citing litigation misconduct by A–Roo. The district court granted that motion, declaring the case exceptional on the grounds that A–Roo had engaged in vexatious litigation and litigation misconduct. In particular, the court found that A–Roo had misrepresented the basis for its original inequitable conduct counterclaim in answers to the original plaintiffs' interrogatories and in the deposition of Scott Gilbert, president of A–Roo. The district court also found that A–Roo had engaged in "bad faith motion practice" by: (1) moving for a five-month extension of time within 30 days of the close of discovery; (2) filing an emergency motion six weeks after the close of discovery to extend all deadlines twelve months and continue the trial until January 2000; (3) moving to continue trial for three weeks to allow an additional attorney to participate; (4) requesting the court to reconsider the emergency motion to extend deadlines; and (5) moving for entry of judgment in favor of Appellees the day before trial was set to begin.

Because of what the court called "egregious" conduct, and because A–Roo "failed to use reasonable care in assessing the validity of defenses and claims they asserted," the district court held that Appellees had shown by clear and convincing evidence that the case was exceptional under 35 U.S.C. § 285. *See Prima Tek II, LLC v. A–Roo Co.*, No. 97–869–DRH, slip op. at 6 (S.D.Ill. Mar. 16, 1999) (Order). Accordingly, the district court awarded attorney's fees and costs to Appellees in the amount of $368,093.06. *See Prima Tek II, LLC v. A–Roo Co.*, No. 97–869–DRH, slip op. at 2 (S.D.Ill. Sep. 2, 1999).

A–Roo appeals the district court's judgment that this case was exceptional under 35 U.S.C. § 285 and the award of attorney fees and costs to Appellees. We have jurisdiction pursuant to 28 U.S.C. § 1295 (1994).

## II

■ As a threshold issue, we must determine whether any of the Appellees in this suit had standing to maintain an infringement action against A–Roo without joining Southpac—the owner of all six patents in suit. If no party had standing in the district court, then jurisdiction is not proper on appeal. *See* U.S. Const. Art. III, § 2; *Warth v. Seldin*, 422 U.S. 490, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention."). Whether a party has standing to sue is a question that this court reviews *de novo*. *See Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1092, 45 USPQ2d 1368, 1369 (Fed.Cir.1998); *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551, 35 USPQ2d 1065, 1074 (Fed.Cir.1995) (en banc).

■ Standing to sue for patent infringement derives from the Patent Act,

which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (1994). As defined in section 100(d), the term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d) (1994). A transfer of "title" to a patent—also called an assignment—is governed by 35 U.S.C. § 261, which states that:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

35 U.S.C. § 261 (1994). Section 261 recognizes, and courts have long held, that an exclusive, territorial license is equivalent to an assignment and may therefore confer standing upon the licensee to sue for patent infringement. *See, e.g., Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *Enzo,* 134 F.3d at 1093, 45 USPQ2d at 1370; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d 870, 875, 20 USPQ2d 1045, 1049 (Fed.Cir.1991). Conversely, a "bare licensee"—one who enjoys only a nonexclusive license—has no standing to sue for infringement under the Patent Act. *See Rite–Hite,* 56 F.3d at 1553, 35 USPQ2d at 1076.

Although an exclusive licensee may have standing to participate in a patent infringement suit, in some cases it must still be joined in suit by the patent owner. In *Independent Wireless,* the Supreme Court held that, where a patent infringement suit was brought by an exclusive licensee, the patent owner was an indispensable party who was required to be joined, either voluntarily as a plaintiff or involuntarily (by process) as a defendant, in order to satisfy the requirements of standing. *See* 269 U.S. at 468, 46 S.Ct. 166. The holding of *Independent Wireless* was incorporated into the Federal Rules of Civil Procedure in 1937 with the adoption of Rule 19. *See* Fed.R.Civ.P. 19, Advisory Committee Note to Subdivision (a) (1937), reprinted in 12A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice & Procedure App. C at 264 (Supp.2000) (hereinafter "Wright & Miller"). Rule 19 was significantly amended in 1966 to include a set of considerations for determining when a party "should be joined" and whether to dismiss an action on the ground that a party who "should be joined" cannot be so joined. *See generally,* Wright & Miller, *supra,* § 1601, at 4–18.

■ As a general rule, this court continues to adhere to the principle set forth in *Independent Wireless* that a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee. *See, e.g., Abbott Labs.,* 47 F.3d at 1131, 33 USPQ2d at 1774 ("A licensee may obtain sufficient rights in the patent to be entitled to seek relief from infringement, but to do so, it ordinarily must join the patent owner."). However, this general rule–which we recognize as being prudential rather than constitutional in nature–is subject to an exception. The exception is that, where the patentee makes an assignment of all substantial rights under the patent, the assignee may be deemed the effective "patentee" under 35 U.S.C. § 281 and thus may have standing to maintain an infringement suit in its own name. *See Vaupel,* 944 F.2d at 875, 20 USPQ2d at 1049; *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1030, 34 USPQ2d 1444, 1446 (Fed.Cir.1995). The question before us, then, is whether the assignment from Southpac to Prima Tek I conveyed sufficient rights in the patents to warrant an exception to the *Independent Wireless*

rule—that is, whether the assignment transferred "all substantial rights" in the patents to Prima Tek I.

■ To determine whether a license agreement has conveyed all substantial rights in a patent, and is thus tantamount to an assignment, we must ascertain the intention of the parties and examine the substance of what was granted. *See Vaupel,* 944 F.2d at 874–75, 20 USPQ2d at 1048–49. In so doing, it is helpful to look at what rights were retained by the grantor. *See id.* A–Roo argues that the agreement between Southpac and Prima Tek I is not equivalent to an assignment because: (1) the agreement is limited in duration and expires automatically unless Southpac opts to renew it; and (2) any rights transferred are solely for the purpose of granting a license to Prima Tek II, which necessarily restricts Prima Tek I's rights under the patents. We consider each of these arguments in turn.

## A

■ A–Roo first argues that, because the license from Southpac to Prima Tek I covers less than the full term of the licensed patents, the agreement cannot be relied upon to circumvent the joinder rule of *Independent Wireless.* We disagree with this reasoning. While it is true that the agreement is temporally limited to an initial two-year period followed by successive, renewable one-year periods, that fact alone does not deprive the licensee of standing to maintain a patent infringement suit in its own name. In *Waterman v. Mackenzie,* the Supreme Court held that, where a patent owner mortgaged her patent to secure a loan, the mortgagee—as equitable owner of the patent during the loan period—had standing to sue for infringement without being joined by the patent owner. *See* 138 U.S. at 261, 11 S.Ct. 334. Thus, while acknowledging the possibility that title to the patent could

revert back to the mortgagor prior to the expiration of the patent term, the Court concluded that this, alone, did not make the mortgagor an indispensable party to the infringement suit. *See id.* at 260–61, 11 S.Ct. 334.

In *Vaupel,* we applied the Supreme Court's reasoning in *Waterman* to a license agreement in which the patent owner retained a reversionary right in the patent. The agreement in question contained a termination clause whereby the license would terminate automatically if the licensee filed for bankruptcy or stopped production of the patented product. *See Vaupel,* 944 F.2d at 874, 20 USPQ2d at 1048. We held that the termination clause was "entirely consistent with an assignment" and therefore did not preclude the licensee from having standing to sue in its own name. *Id.* at 875, 944 F.2d 870, 20 USPQ2d at 1049 (citing *Waterman,* 138 U.S. at 256, 11 S.Ct. 334).

Like the agreement in *Vaupel,* the agreement between Southpac and Prima Tek I vests the patent owner with a reversionary right in the licensed patents. This is because the license automatically terminates if the agreement is not renewed by Southpac, with all rights in the patents reverting back to Southpac. Significantly, the agreement does not specify a "hard" termination date beyond which the license cannot be renewed, *cf. Moore U.S.A. Inc. v. Standard Register Co.,* 60 F.Supp.2d 104, 109–10, 52 USPQ2d 1620, 1624–25 (W.D.N.Y.1999) (infringement suit brought by exclusive licensee for finite term of five years required joinder of patentee), and we express no opinion as to the effect of such a provision on a licensee's standing to sue.

A–Roo attempts to distinguish the license agreement in this case from that in *Vaupel* on the ground that Southpac—the licensor—effectively retained the ability to terminate the license at will, regardless of

whether Prima Tek I breached the agreement or filed for bankruptcy. A–Roo cites *Bell Intercontinental Corp. v. United States* for the proposition that a transfer of patent rights, terminable at the discretion of the grantor prior to the patent's expiration, "will ordinarily constitute a licensing arrangement rather than a sale inasmuch as the transfer does not convey to the transferee all substantial rights in the patent." 180 Ct.Cl. 1071, 381 F.2d 1004, 1020–21, 152 USPQ 182, 192 (1967). Although we are bound by decisions of the Court of Claims, *see South Corp. v. United States*, 690 F.2d 1368, 1371, 215 USPQ 657, 658 (Fed.Cir.1982) (en banc), the holding in *Bell* does not mandate the result that A–Roo advocates.

*Bell* did not involve an action for patent infringement. Rather, it involved a suit for the refund of income taxes. The question before the *Bell* panel was whether certain payments received for the transfer of patent rights constituted proceeds from a sale, taxable as long-term capital gains, or from a license, taxable as ordinary income. The Court of Claims was not guided in its analysis by the patent statute, nor by the constitutional and prudential principles of standing. Rather, the court was guided entirely by the Internal Revenue Code and binding interpretations thereof, which provided specific guidelines governing the sale of capital assets. The court's analysis focused primarily on the relative *value* of the patent rights in question–those received by the grantee versus those retained by the grantor—and gave no consideration to the issue of standing. Accordingly, we conclude that the holding in *Bell* is limited to the income tax context and has no bearing on the case at bar.

Having concluded that neither the termination clause nor the renewal cycle of the license agreement between Southpac

and Prima Tek I required Southpac to be joined in this action, we turn now to A–Roo's second argument.

## B

■ A–Roo argues that the agreement between Southpac and Prima Tek I cannot be considered a transfer of all substantial rights in the patents because Prima Tek I's rights extend "only to the extent necessary for [Prima Tek I] to grant a license to Prima Tek II." According to A–Roo, although the agreement purports to grant Prima Tek I the right to make, use and sell the patented products, those rights were never actually conveyed to Prima Tek I. Instead, Prima Tek I received, at most, a "license to license" which A–Roo claims falls short of transferring "all substantial rights" in the patents. We agree.

A patent represents the legal right to exclude others from making, using, selling, or offering to sell a patented invention in the United States, and from importing the invention into the United States. *See* 35 U.S.C. § 154 (1994). Implicit in the right to exclude is the ability to waive that right, *i.e.*, to license activities that would otherwise be excluded, such as making, using and selling the patented invention in the United States. Those activities, of course, may be subject to further limitations such as governmental restrictions or "blocking" patents.[2]

■ In evaluating whether a particular license agreement transfers all substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys *in full* the right to exclude others from making, using and selling the patented invention in the exclusive territory. *See, e.g., Abbott Labs.*, 47 F.3d at 1132–33, 33 USPQ2d at 1774–75 (licensee

---

2. A "blocking patent" is an earlier patent that must be licensed in order to practice a later patent. This often occurs, for instance, between a pioneer patent and an improvement patent.

lacked independent standing to sue where patent owner retained limited right to make, use and sell patented products); *see also Agrashell, Inc. v. Hammons Prods. Co.*, 352 F.2d 443, 446–47, 147 USPQ 347, 349 (8th Cir.1965) (same); *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F.Supp. 1352, 1373, 27 USPQ2d 1161, 1177 (D.Del. 1993) (Pfizer's right not exclusive because patent owner retained right to market patented product). In this case, it is clear that the right to exclude did not inure to Prima Tek I under the agreement with Southpac. Under the terms of the agreement, Prima Tek I's right to exclude was explicitly defined—and then extinguished—by the sub-license to Prima Tek II. Prima Tek I could not, for example, exclude others with regard to the patents prior to the sub-license to Prima Tek II because the exercise of such right would have fallen outside the limited scope of the license from Southpac. Likewise, following the sub-license to Prima Tek II, Prima Tek I had no right to exclude others from practicing the patents because that right— to the extent that Prima Tek I ever possessed it—flowed to Prima Tek II.

Absent the right to exclude others from making, using and selling the patented inventions, Prima Tek I's asserted role as "effective patentee" is doubtful. We are further troubled by the fact that the agreement gives Prima Tek I virtually no control over the ability to sub-license the patents.

A licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights. In *Vaupel*, we held that a "sub-licensing veto," which required the licensee to obtain written consent of the patent owner for all sub-licenses, was only "a minor derogation from the grant of rights" and thus did not deprive the licensee of standing to sue in its own name. 944 F.2d at 875, 20 USPQ2d at 1049.

Unlike the agreement in *Vaupel*, the agreement in this case goes far beyond a mere "sub-licensing veto." Instead of simply allowing the patent owner to approve or disapprove sub-licenses, the agreement in this case *requires* that Prima Tek I execute a sub-license to Prima Tek II and to no one else. Furthermore, because the rights granted by Southpac to Prima Tek I are circumscribed by the sub-license to Prima Tek II, the agreement effectively nullifies all of Prima Tek I's exclusive territorial rights in the patents. *Cf. Watson v. United States*, 222 F.2d 689, 691, 105 USPQ 352, 354 (10th Cir.1955) (sub-licensing veto did not deprive licensee of standing to sue in its own name because it "was intended to protect the rights of the parties under the contract, not to proscribe, limit, or nullify their intent and purpose to vest immediately in the transferee the right to manufacture, sell, and use the [patented products] throughout the life of the patent"). Because Prima Tek I's rights under the agreement are significantly diminished by the sub-license requirement, we cannot say that the requirement is merely a "minor derogation" from the grant of rights. Accordingly, we conclude that the agreement does not transfer all substantial rights in the patents to Prima Tek I.

### C

■ Appellees maintain that Southpac is not a necessary party to this suit because the policy underlying the rule of *Independent Wireless, i.e.,* that an accused infringer should not be subject to multiple suits on the same patent, would not be undercut in this case by allowing Prima Tek I to sue in its own name. This is so, according to Appellees, because Southpac has expressly agreed to be bound by any judgment rendered in an action to which Prima Tek I is a party. Essentially, Appellees assert that Southpac's agreement to be bound is sufficient to confer standing on Prima Tek I to sue on its own behalf. We disagree.

Appellees are correct that one of the underlying policies of the rule of *Independent Wireless* is to prevent duplicative litigation against a single accused infringer. *See Vaupel,* 944 F.2d at 875, 20 USPQ2d at 1049 (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 38, 43 S.Ct. 254, 67 L.Ed. 516 (1923)). This does not mean, however, that a patent owner's agreement to be bound by all judgments against a licensee, such as the one entered into by Southpac, necessarily resolves the issue of standing. Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments. As we explained in *Ortho Pharm.*:

> Express covenants may, of course, regulate the duties between the licensor and licensee to implement the rights of the parties. However, a contract cannot change the statutory requirement for suit to be brought by the "patentee." By the same token, a right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights. A patentee may not give a right to sue to a party who has no proprietary interest in the patent.

52 F.3d at 1034, 34 USPQ2d at 1450 (citations omitted).

■■■■ Just as a "right to sue" clause cannot confer standing on a bare licensee, neither can a patent owner's agreement to be bound by judgments against a licensee circumvent the rule of *Independent Wireless* that the patent owner must ordinarily join, in any infringement action, an exclusive licensee who possesses less than all substantial rights in the patent. To hold otherwise would be to allow a patent owner to effectively grant a "hunting license," solely for the purpose of litigation, in the form of a *pro forma* exclusive license, *e.g.,* covering only a minuscule territory. The Supreme Court long ago disapproved of such arrangements. *See Crown Die & Tool,* 261 U.S. at 42, 43 S.Ct. 254 ("The profits or damages for infringement cannot be sued for except on the basis of title as patentee, or as such assignee or grantee, to the whole or a part of the patent, and not on the basis merely of the assignment of a right to a claim for profits and damages, severed from such title.") (quoting with approval *Gordon v. Anthony,* 10 F. Cas. 772, 778–79 (S.D.N.Y.1879)). Accordingly, we reject Appellees' argument that Southpac's agreement to be bound by judgments against Prima Tek I resolves the issue of standing in this case.

D

■■■■ Finally, in a post-appeal motion, Appellees argue that this court has the authority, under Fed. R.App. P. 27, to join Southpac as an indispensable party in order to correct standing and, thus, preserve jurisdiction. *See* Appellees' Motion to Join Additional Party–Appellee at 5–6, *Prima Tek II v. A–Roo Co.,* No. 99–1581 (filed June 12, 2000) (citing *Mullaney v. Anderson,* 342 U.S. 415, 417, 72 S.Ct. 428, 96 L.Ed. 458 (1952)). Our authority to join or dismiss a party on appeal "should be exercised sparingly," *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 837, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), and the facts of this case do not warrant exercise of that power. In particular, we note that, unlike the situation in *Mullaney,* where the issue of standing was not raised until the case was on appeal, A–Roo specifically challenged Appellees' standing in the district court. Furthermore, it is likely that A–Roo would be prejudiced by the joinder of Southpac on appeal insofar as A–Roo was deprived of the opportunity to conduct discovery on Southpac—the owner of all six patents in suit—because Southpac was beyond the jurisdiction of the district court. *Cf. Mullaney,* 342 U.S. at

417, 72 S.Ct. 428 (justifying joinder of a party-plaintiff on appeal on the ground that it would "in no wise embarrass the defendant").

### III

Because the agreement between Southpac and Prima Tek I did not convey to Prima Tek I all substantial rights in the patents in suit, we conclude that Prima Tek I did not have standing to sue in its own name. Since the remaining Appellees, Prima Tek II, HSC and HMSC, all derived their ownership interests in the patents from Prima Tek I, they too lacked standing to sue in the district court without being joined by the patent owner.[3] This is because an owner or licensee of a patent cannot convey that which it does not possess. *See Dunham v. Indianapolis & St. Louis R.R.*, 8 F. Cas. 44, 44 (N.D.Ill. 1876) ("[I]t is clear that [a] patentee[ ] can not grant what does not belong to him, and if he gives a license or makes a contract for the use of the thing patented, he can only grant that which he has himself . . .").

We conclude, therefore, that the district court erred in not dismissing this suit for lack of standing. Accordingly, we reverse the district court's award of attorney fees to Appellees.

For the reasons stated above, we deny Appellees' motion to join Southpac as a party-appellee.

### COSTS

No costs.

## REVERSED AND VACATED

---

**3.** We express no opinion as to whether HSC or HMSC have standing to participate in this suit; that is, whether they are bare licensees or exclusive licensees of the patents.