**MIDDLETON, INC., Plaintiff,**

v.

**MINNESOTA MINING AND MANU-FACTURING COMPANY (3M Company), Defendant.**

**Civil No. 4:03–CV–40493–MWB–TJS.**

United States District Court, S.D. Iowa, Central Division.

Jan. 26, 2012.

---

Joseph A. Grear, George C. Summerfield, Keith A. Vogt, Stadheim & Grear, Chicago, IL, Suzanne J. Levitt, Drake University Legal Clinic, Gregory R. Brown, Duncan Green Brown Langeness & Eckley PC, Des Moines, IA, for Plaintiff.

Kevin Herbert Rhodes, St. Paul, MN, Ross W. Johnson, Carolyn A. Gunkel, Faegre Baker Daniels LLP, Des Moines,

IA, Christopher J. Burrell, David J.F. Gross, James W. Poradek, Katherine S. Razavi, Theodore M. Budd, Faegre Baker Daniels LLP, Minneapolis, MN, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING MIDDLETON'S MOTION FOR SUMMARY JUDGMENT THAT IT HAS STANDING TO MAINTAIN THIS ACTION**

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1135
 A. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1135
 B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1137
 1. Middleton's corporate history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1137
 2. The '514 patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1137
 3. The licensing agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

II. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1141
 A. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1141
 B. Middleton's Constitutional Standing Theories . . . . . . . . . . . . . . . . . . . . . . . . 1143
 1. Standing based on the 1992 and 1996 agreements . . . . . . . . . . . . . . . . . 1144
 a. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1144
 b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1145
 2. Standing based on the 1987 agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 1147
 a. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1147
 b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1149

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1151

## I. INTRODUCTION

The seminal case explicating federal judicial power, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), teaches the indelible lesson that, while "[i]t is emphatically the province and duty of the judicial department to say what the law is," the federal courts are, nonetheless, of limited jurisdiction. *Id.* at 176–77, 179–80. Before me now, on plaintiff Middleton, Inc.'s Motion For Summary Judgment That It Has Standing To Maintain This Action (docket no. 221), this patent infringement case, while not as hoary as *Marbury* (but getting close after a nearly sixteen-year tenure in the federal courts), is a potent reminder of this court's limited jurisdiction. As this case demonstrates, constitutional standing, no matter when it is raised—and in spite of the enormous resources expended by the parties in the last decade and a half—is an uncompromising requirement for any lawsuit in federal court.

### A. Procedural Background

This case presents a long and storied procedural background. I do not recite all of its chapters in detail here but, instead, provide sufficient background to frame the motion currently before me. I quote from Chief Judge James Gritzner's August 24, 2004, 2004 WL 1968669, Order to explain the early stages of this case:

The Plaintiff, Middleton, Inc. ("Middleton"), commenced this action against the Defendant, Minnesota Mining and Manufacturing Co. ("3M"), in the United States District Court for the Northern District of Illinois, Chicago Division, on October 17, 1996. After much litigation activity in that district, the Honorable James F. Holderman of the Northern District of Illinois transferred the action to this Court on August 29, 2003. Jurisdiction is proper pursuant to 28 U.S.C.

§ 1331, the federal question statute, and 28 U.S.C. § 1338(a), as this case arises under the federal patent laws, 35 U.S.C. §§ 101 *et seq.*

The lawsuit alleges infringement of a patent held by Middleton, specifically, U.S. Patent No. 4,944,514 ("the '514 patent"), by 3M.... 3M filed an application for reexamination and learned on July 26, 2004, that the PTO had granted the request. The pending reexamination prompted [3M's] motion to stay, which Middleton has resisted.

(docket no. 178, p. 2.) In his August 24, 2004, Order, Chief Judge Gritzner granted 3M's motion to stay the case pending the PTO's reexamination of the '514 patent. *Id.* at 26. The PTO concluded its reexamination on September 20, 2011. Shortly thereafter, upon Middleton's unopposed motion, Chief Judge Gritzner lifted the stay in this case on October 20, 2011 (docket no. 210). On October 26, 2011, Chief Judge Gritzner transferred this case to me, pursuant to my cross-designation in the United States District Court for the Southern District of Iowa (docket no. 217).[1]

On November 9, 2011, 3M's counsel sent Middleton's counsel a letter, asserting that Middleton does not have standing to sue 3M for infringement of the '514 patent and requesting that Middleton dismiss this case. *See* Middleton Appendix at 76. On November 10, 2011, the parties appeared for a scheduling conference before Chief United States Magistrate Judge Thomas J. Shields, during which the parties apprised Judge Shields of their dispute regarding

Middleton's standing and discussed briefing the issue (docket no. 219).

On November 15, 2011, Middleton filed its Motion For Summary Judgment That It Has Standing To Maintain This Action (docket no. 221), in which it presents two alternate theories of standing, each based on a series of licensing agreements. On November 30, 2011, 3M filed its Brief In Opposition To Middleton's Standing Brief And In Support Of Dismissal Of Case For Lack of Subject Matter Jurisdiction Under Article III And Rule 12(h)(3) (docket no. 230). Middleton submitted its reply on December 6, 2011 (docket no. 232).

I heard oral arguments on these issues on January 18, 2012.[2] George Summerfield (argued) and Joseph Grear of Stadheim & Grear, Chicago, and Gregory Brown of Duncan Green Brown Langeness & Eckley, Des Moines, appeared on behalf of Middleton. James Poradek (argued) and Katherine Razavi of Faegre Baker Daniels, Minneapolis, and Ross Johnson of Faegre Baker Daniels, Des Moines, appeared on behalf of 3M. The briefing on this motion was exceptional, and the oral arguments crystallized the issues with precision. The oral arguments in this case were some of the finest I have heard in my nearly eighteen-year career as a federal district court judge. The hallmark of most lawyers is that they excel at making simple things unduly complicated. It is the rare lawyer who has the uncanny ability to make the unusually complicated simple. In my view, this is the sign of a great lawyer. The advocates who argued this motion are great lawyers.

1. Over the past several years, Chief Judge Gritzner has graciously accepted several cases from the Northern District of Iowa that were related to cases already pending in the Southern District. In return, I asked him to transfer a Southern District case to me.

2. During oral arguments, Middleton cited new authority from the United States District

Court for the Central District of California. *See NeuroGrafix et al. v. Regents of the Univ. of Cal.,* No. 2:11–cv–07591–MRP–RZ (C.D.Cal. Jan. 4, 2012) (minute opinion). I asked Middleton to email me the ruling, and I permitted 3M to submit a brief response. I have considered both the ruling and 3M's response.

### B. Factual Background

As with the procedural background, I do not attempt a complete recitation of the factual background of this case. Rather, I set forth sufficient facts, both undisputed and disputed, to put in context the parties' arguments regarding Middleton's pending motion for summary judgment that it has standing. Unless indicated otherwise, the parties agree that the facts stated are undisputed.

### 1. Middleton's corporate history

Middleton, a Florida corporation, possesses a complicated corporate lineage—one that must be parsed to determine which rights, if any, Middleton holds in the '514 patent. Perry–Austen International, Inc. ("Perry–Austen"), now an inactive Iowa corporation, was formed on October 16, 1979. On November 16, 1992, Perry–Austen changed its name to Middleton, Inc., an Iowa corporation. On December 23, 1994, Middleton Acquisition Corp. was founded as a Florida corporation. On December 31, 1994, Middleton Acquisition Corp. merged with Middleton, Inc., the Iowa corporation. The Plan of Merger named Middleton Acquisition Corp. as the surviving corporation and Middleton, Inc. as the disappearing corporation, and provided that "Survivor [Middleton Acquisition Corp.] will succeed to all properties, rights, and other assets of and shall be subject to all liabilities of Disappearing [Middleton, Inc.]." 3M Appendix at 10. Additionally, as a condition of the merger, Middleton Acquisition Corp. changed its name to Middleton, Inc. It is this Middleton, Inc., the Florida corporation, that brings this lawsuit. I have charted the various corporate transitions below:

### 2. The '514 patent

On December 13, 1988, inventor James Suiter filed application number 283,863 ("the '863 application") to obtain a patent for his floor finishing material and method. On April 3, 1990, Suiter assigned the '863 application, including "the entire right, title and interest in and to the said application and the invention therein contained," to Suitco Surface, Inc. ("Suitco"), of which he was president. 3M Appendix at 3. Shortly thereafter, on July 31, 1990, the '863 application issued as patent number '514, with Suiter listed as the inventor and Suitco as the assignee of the patent. Middleton Appendix at 79. Suitco remained the sole owner of the '514 patent until it expired in July 2007.

The '863 application, and the '514 patent into which it matured, are a continuation-in-part of the '428 application and a continuation-in-part of the '617 application, which, in turn, is a continuation of the '318 application. *See* Middleton Appendix at 79; Middleton's Statement of Facts ¶ 8 (docket no. 221–2).

### 3. The licensing agreements

From the late eighties to the mid-nineties, Suiter and his wife Patricia ("the Suiters") signed several patent licensing agreements with different companies—nearly all of which were affiliated with Lyle Middleton, who is now deceased. On November 6, 1987, the Suiters entered into a licensing agreement ("the 1987 agreement") with Perry–Austen. Lyle Middleton signed the 1987 agreement on behalf of Perry–Austen, as Chairman of the Board and Chief Executive Officer. The licensing agreement provided, in relevant part:

> Suiter hereby grants to Perry–Austen an exclusive, worldwide, unlimited, and irrevocable right and license under the claims of Licensor Patent Rights to manufacture, have manufactured, use, sell, have sold, and market the Bowling Lane Refinishing Apparatus and Method covered by Patent Application Serial No. 871,381 [*sic*] and the Bowling Lane Refinishing Apparatus covered by Patent Serial No. 940,428 and to any process or method in the manufacture or use thereof. Suiter agrees that this grant of license shall be exclusive and that he shall grant no further licenses to any other party. All rights which Suiter may have under his Licensor Patent Rights are hereby transferred to Perry–Austen.

Middleton Appendix at 10–11. The 1987 agreement defined "Licensor Patent Rights," as follows:

> (1) Patent Application Serial No. 871,-318 filed June 6, 1986 and entitled "Bowling Lane Refinishing Apparatus and Method";

> (2) Patent Application Serial No. 940,-428, filed December 11, 1986 and entitled "Bowling Lane Refinishing Apparatus";

> (3) Any other United States Letters Patent owned by Suiter or under which Suiter now has or at any time in the future [*sic*] may have the right to grant licenses which are related to the foregoing; and

> (4) any divisions, reissues [*sic*], continuations-in-part and extensions of the foregoing now owned by Suiter or under which Suiter now has the right to grant licenses or for which Suiter has an application for patent rights pending.

Middleton Appendix at 10.

On July 7, 1992, the Suiters entered into an "Amendment to Patent License Agreement" ("the 1992 Amendment") with Perry–Austen (also signed by Lyle Middleton on behalf of Perry–Austen), which provided, in relevant part:

> WHEREAS Suiter and Perry–Austen previously entered into a Patent License Agreement, dated November 6, 1987 (the "Patent License Agreement"); and

> . . .

> WHEREAS, Suiter and Perry–Austen . . . desire to modify the Patent License Agreement so as to clarify that foreign patents were to be included in the exclusive license, to identify the present U.S. Patents, and to clarify the products and services covered by the patents.

> NOW, THEREFORE, in consideration of the mutual covenants and promises of the parties, it is hereby agreed that the Patent License Agreement is amended in the following respects: . . .

> (b) 'Licensor Patent Rights' shall mean U.S. Patent Nos. 4,795,152; 4,867,816; 4,944,514; and all other U.S. and foreign Letters Patent owned by Suiter or under which Suiter now has or at any time in the future may have the right to grant licenses which are related to the

foregoing; including, but not limited to, all divisions, continuations, continuation-in-part, reissues, reexaminations, extensions, and foreign counterparts related to the above identified issued U.S. Patents.

Middleton Appendix at 17–18. Suitco, the owner of the '514 patent, was not a party to the 1992 amendment.

On December 7, 1992, the Suiters signed a licensing agreement with Basic Coatings, Inc. (Basic Coatings), an Iowa corporation ("the Basic–Suiter agreement").[3] Lyle Middleton signed on behalf of Basic Coatings as Chairman of the company. Suitco, the owner of the '514 patent, was not a party to the Basic–Suiter agreement. The Basic–Suiter Agreement purported to grant to Basic Coatings an exclusive field-of-use license in several patents, including the '514, for all non-bowling related uses: [4]

> Suiter hereby grants to Licensee an exclusive, worldwide, unlimited, and irrevocable right to license under the claims of the Licensor Patent Rights to manufacture, have manufactured, use, sell,

have sold, and market the Products. . . . All rights which Suiter may have under the Licensor Patent Rights which relate to uses other than Bowling Lane Applications are hereby transferred to Basic.

Middleton Appendix at 24. The Basic–Suiter Agreement defined "Licensor Patent Rights," as follows:

> "Licensor Patent Rights" shall mean U.S. Patent Nos. 4,795,152; 4,876,816, 4,944,514; and all other U.S. and foreign Letters Patent owned by Suiter or under which Suiter now has or at any time in the future may have the right to grant licenses which are related to the foregoing; including, but not limited to, all divisions, continuations, continuations-in-part, reissues, reexaminations, extensions, and foreign counterparts related to the above identified issued U.S. Patents.

Middleton Appendix at 23. The Basic–Suiter Agreement also purported to terminate the 1987 agreement between the Suiters and Perry–Austen. Middleton Appendix at 22–23, 28.[5]

---

3. The Basic–Suiter agreement was one of a set of three agreements signed by the Suiters, Basic Coatings, and Brunswick Bowling & Billiards Corporation ("Brunswick") on December 7, 1992: one agreement signed by all parties, one agreement signed by the Suiters and Brunswick, and the Basic–Suiter agreement.

4. Pursuant to this same set of agreements, the Suiters purported to grant to Brunswick an exclusive field-of-use license in the same patents for all bowling related uses. *See* Middleton Appendix at 64. Nonetheless, I focus my analysis on the license to Basic Coatings because, as explained *infra*, Middleton bases its first theory of constitutional standing on licensing rights that it allegedly received from Basic Coatings. Moreover, Middleton does not allege any infringement of bowling-related uses of the '514 patent: "There is no indication that the accused products [made by 3M] have ever been sold for, or used in, bowling alley applications." Middleton's Memorandum In Support at 3 (docket no. 221–1).

5. To elucidate this web of licenses, I quote from James Suiter's deposition to explain the apparent goal of terminating the 1987 agreement with Perry–Austen, of which Lyle Middleton was President and Chairman, and entering into the 1992 agreements with Basic Coatings, of which Lyle Middleton was Chairman, and Brunswick:

Q: Well, why did you go from the one agreement in November of '87 to the three separate agreements in December of '92?

A: Oh, oh. Brunswick bought Perry–Austen, and so Perry–Austen—and because they wanted to—the bowling lanes surface, and so in order for them to buy—for Lyle to give them the rights, we had to approve it; and we had to say, okay, so we needed a—an agreement with Brunswick Corporation as well as with Lyle, and they split our original agreement up between bowling lane surface and other uses of the bowling lane surface, so Brunswick got the bowling lane part of the agreement, and Lyle Middleton kept the other uses of the patents, so he still had exclusive

Also on December 7, 1992, the Suiters and Suitco entered into an agreement ("the Suiter–Suitco agreement"), which provided, in relevant part:

Agreement made as of this 7th day of December 1992, by Suitco Surface, Inc. ("Company") a Nebraska corporation and James and Patricia Suiter (collectively "Patent Owner");

WHEREAS, as of December 7, 1992 Patent Owner entered into a License Agreement (the "License Agreement") with Basic Coatings, Inc., ("Basic") an Iowa corporation with respect to certain Licensor Patent Rights (as defined therein); and

WHEREAS, Company is the record owner of certain rights under and with respect to a patent related to the Licensor Patent Rights; and

WHEREAS, Company authorized, directed and empowered Patent Owner to enter into the License Agreement, licensing the Licensor Patent Rights, and Company wishes and intends to join and to be bound under the License Agreement; and

WHEREAS, James Suiter is the sole shareholder of Company and intends and desires that Basic as the Licensee under the License Agreement shall have and enjoy any and all right, title and interest in and to the Licensor Patent Rights provided for in the License Agreement; . . . .

2. *Joinder.* Company hereby joins in the License Agreement as a licensor party, effective on and as of December 7, 1992, and on and as of such date makes, enters into and agrees to each and every covenant, representation and warranty made by Licensor under the License Agreement. Company and Patent Owner shall be jointly and severally

liable under the License Agreement for all of Licensor's obligations thereunder and Company shall be included within the defined terms "Licensor" and "Suiter" as used in the License Agreement.

Middleton Appendix at 20. Basic Coatings was not a party to the Suiter–Suitco agreement.

Additionally, Middleton asserts that Basic Coatings and Middleton entered into an agreement on October 1, 1996 ("the 1996 agreement"), under which Basic Coatings assigned its exclusive license rights under the Basic–Suiter Agreement to Middleton:

Agreement made as of this 1st day of October, 1996, by Basic Coatings, Inc., ("Basic"), an Iowa corporation, and Middleton, Inc. ("Middleton"), an Iowa corporation,

WHEREAS, as of December 7, 1992, Basic has entered into a License Agreement (the "License Agreement") with Suitco Surface, Inc. ("Suitco") and James and Patricia Suiter (collectively, "Suiters") with respect to certain Licensor Patent Rights (as defined therein); and

WHEREAS, under such License Agreement, Basic has the right, power, and authority to make assignments and grant licenses to other entities with respect to such Licensor Patent Rights; . . . .

2. *Assignment.* Basic hereby assigns, transfers, and conveys to Middleton all of its right, title and interest in and to the Licensor Patent Rights provided for in the License Agreement. . . .

Middleton Appendix at 72–73. The 1996 agreement contains a signature block for each company, with Lyle Middleton as President of Basic Coatings, and Lyle Mid-

---

rights on all the other uses for it, and Brunswick had exclusive rights for the bowling lane part of it.

Middleton Appendix at 118.

dleton as President for Middleton, Inc., but it is unsigned. Middleton Appendix at 75. Thus, 3M contends that Middleton has not shown that the unsigned agreement was ever executed. Moreover, 3M notes that the 1996 agreement purports to transfer rights to "Middleton, Inc., an Iowa corporation," although Middleton, Inc., the Iowa corporation, dissolved on December 31, 1994. Thus, 3M asserts that the agreement is invalid.

I provide a chart below to summarize the ownership progression of the '514 patent and the various licensing agreements:

### Chronology of Events

**November 6, 1987:** Suiters and Perry–Austen enter into licensing agreement for the '318 and '428 patent applications (1987 Agreement)

**December 13, 1988:** Suiter files the '863 application (which matures into the '514 patent)

**April 3, 1990:** Suiter assigns all rights in the '863 application to Suitco

**July 31, 1990:** The '514 patent issues, with Suiter as the inventor and Suitco as the assignee

**July 7, 1992:** Suiters and Perry–Austen amend the 1987 agreement and "identify" the '514 patent as included in the "Licensor Patent Rights" (1992 amend-

ment); Suitco is not a party to this amendment

**December 7, 1992:** Suiters and Basic Coatings enter into licensing agreement for all non-bowling-related uses of the '514 patent (Basic–Suiter agreement); Suitco is not a party to this agreement

**December 7, 1992:** Suiters and Suitco enter into an agreement, which states that Suitco joins in the Basic–Suiter agreement as a "licensor party" (Suiter–Suitco agreement); Basic Coatings is not a party to this agreement

**October 1, 1996:** Basic Coatings and Middleton, Inc. (Iowa corp.) purportedly enter into an agreement in which Basic Coatings assigns its license in the '514 patent to Middleton, Inc. (1996 agreement); the agreement is unsigned; Middleton, Inc., the Iowa corp., dissolved on December 31, 1994

## II. ANALYSIS

### A. Legal Standards

This case comes before me with a unique procedural posture. Ordinarily, rather than the plaintiff moving for summary judgment that it *has* standing, the defendant would move to dismiss, or move for summary judgment, for lack of standing.[6] Here, in contrast, because Middleton has moved for summary judgment that it has standing to maintain this action, I first

---

**6.** It is this more typical scenario that the United States Supreme Court and the Eighth Circuit Court of Appeals have contemplated when considering the standard of proof a plaintiff must meet to establish that it has standing:

A party invoking federal jurisdiction must support each of the standing requirements with the same kind and degree of evidence at the successive stages of litigation as any other matter on which a plaintiff bears the burden of proof. [*Lujan,* 504 U.S.] at 561, 112 S.Ct. 2130. Therefore "general factual allegations of injury resulting from the defendant's conduct" will suffice to establish Article III standing at the pleading stage, "for on a mo-

tion to dismiss we presume that general allegations embrace those specific facts that are necessary to support [a contested] claim." *Id.* (internal quotation marks and citation omitted). On the other hand, because allegations alone are insufficient to survive a summary judgment motion, a plaintiff at this later stage of the litigation process must "set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken as true." *Id.* (internal quotation marks and citations omitted); *see also* FED.R.CIV.P. 56 (2009). *Constitution Party of S.D. v. Nelson,* 639 F.3d 417, 420–21 (8th Cir.2011).

look to see whether it has met its burden as the summary judgment movant. Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). Procedurally, the moving party—here, Middleton—" 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.' " *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

■ However, because standing is at issue, if Middleton fails to meet its burden as the summary judgment movant, I cannot simply deny summary judgment and allow the case to proceed. Middleton, as "[the] party invoking federal jurisdiction," carries the burden to establish that it has constitutional standing to bring this case. *See Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir.2011). The United States Constitution grants federal courts jurisdiction to hear only "Cases" or "Controversies." U.S. CONST. art. III, § 2, cl. 1. The constitutional standing doctrine has developed to delineate which matters constitute "Cases" or "Controversies" and thus may come before a federal court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Constitutional standing is a "jurisdictional requirement," *see Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156 (8th Cir.2008), and may never

be waived, *see United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("The question of standing is not subject to waiver. . . ."). Middleton has had the opportunity, through its pending motion, to submit any evidence that supports its theories of standing. If, after examining all the evidence that Middleton has produced, I determine that Middleton has not established standing, I lack subject matter jurisdiction and must dismiss this case. *See Faibisch v. University of Minn.*, 304 F.3d 797, 801 (8th Cir.2002); *Farmers State Bank v. Gronstal*, 598 F.Supp.2d 960, 964 (S.D.Iowa 2009); *see also* FED.R.CIV.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

■ To satisfy constitutional standing, "[t]he plaintiff must show that the conduct of which [it] complains has caused [it] to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130). In patent cases, "[i]t is well-settled that '[o]nly a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit. . . .' " *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed.Cir.2010) (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed.Cir.2008)). This is true because only patent owners [7] and exclusive licensees possess "exclusionary rights created by the Patent Act," such that they may "suffer[ ] a legally cognizable injury when an unauthorized party encroaches upon those rights and therefore ha[ve] standing

7. When I refer to "patent owners," I include assignees who own "all substantial rights in the patent"—which makes them, effectively, patent owners. *See WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed.Cir.

2010) (explaining that patent owners, assignees with "all substantial rights in the patent," and exclusive licensees may have standing to sue for infringement).

to sue." *See WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264–65 (Fed. Cir.2010). "To be an exclusive licensee for standing purposes, 'a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.'" *Spine Solutions*, 620 F.3d at 1317 (quoting *Mars*, 527 F.3d at 1367).[8] Unlike a patent assignment, a license need not be in writing. *See Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed.Cir. 2003).

Middleton bases its standing on several licensing agreements allegedly granting it rights in the '514 patent. Therefore, I must scrutinize the agreements to determine the extent of Middleton's rights and, consequently, its standing to sue on the '514 patent. *See WiAV Solutions*, 631 F.3d at 1266 ("Because an exclusive licensee derives its standing from the exclusionary rights it holds, it follows that its standing will ordinarily be coterminous with those rights."); *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed.Cir. 1998) ("Determining whether a licensee is an exclusive licensee ... is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant."); *Rite–Hite Corp. v. Kelley*

*Co., Inc.*, 56 F.3d 1538, 1552 (Fed.Cir.1995) ("To determine whether [licensees] have standing to be co-plaintiffs, we look to their contracts with [the patent owner]."). In interpreting these agreements, I rely on state law, as the Federal Circuit Court of Appeals has instructed that "'state law governs the interpretation of contracts ....'" in patent cases. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (quoting *DDB Techs., L.L.C. v. MLB Advanced Media*, 517 F.3d 1284, 1290 (Fed.Cir.2008)); *see also Board of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 841 (Fed.Cir.2009).[9]

Of course, no matter what rights an agreement purports to convey, only an entity with rights in a patent can license others to use the patent. *See Prima Tek II, L.L.C. v. A–Roo Co.*, 222 F.3d 1372, 1382 (Fed.Cir.2000) ("[A]n owner or licensee of a patent cannot convey that which it does not possess."); *see also Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*, 357 F.3d 1266, 1270 (Fed.Cir.2004) (same). With these standards in mind, I consider the parties' arguments.

### B. Middleton's Constitutional Standing Theories

Middleton advances two alternate theories to establish that it has constitutional standing. I take each in turn.

**8.** A plaintiff must satisfy both constitutional and prudential standing to bring suit in federal court. Although an exclusive licensee may meet the requirements for constitutional standing, "[a]n exclusive licensee generally must join the patent owner to the suit to satisfy prudential standing constraints...." *WiAV Solutions*, 631 F.3d at 1265 n. 1. Nevertheless, "[j]oining the legal title holder only satisfies prudential standing requirements. It cannot cure constitutional standing deficiencies." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1344 (Fed.Cir.2007). Thus, as a threshold matter, an exclusive licensee must inde-

pendently satisfy the requirements for constitutional standing.

Because I find that Middleton lacks constitutional standing to bring this lawsuit, I do not reach the issue of prudential standing.

**9.** These cases note that state law dictates patent contract interpretation, though they also explain the exception that Federal Circuit law determines whether an agreement presently assigns patent rights or is merely a promise to assign in the future—an exception not applicable in this case. *See Abraxis Bioscience*, 625 F.3d at 1364; *Roche Molecular Sys.*, 583 F.3d at 841.

### 1. Standing based on the 1992 and 1996 agreements

#### a. Arguments of the parties

First, Middleton asserts that it has standing because, on December 7, 1992, the Suiters granted Basic Coatings an exclusive license in the '514 patent, and, in 1996, Basic Coatings transferred this exclusive license to Middleton. Middleton acknowledges that Suitco, not the Suiters, owned the '514 patent when the Suiters entered into the licensing agreement with Basic Coatings on December 7, 1992. Nonetheless, Middleton contends that the Basic–Suiter agreement was effective in granting an exclusive license to Basic Coatings because, on the same day, the Suiters and Suitco signed the Suitco–Suiter agreement, which authorized the Suiters to enter into the licensing agreement with Basic Coatings. Middleton urges that to find otherwise would elevate form over substance and ignore the intent of the parties, as James Suiter was the president of Suitco, and he clearly intended, as shown through the Basic–Suiter Agreement and the Suiter–Suitco agreement, to grant Basic Coatings an exclusive license in the '514 patent.

Regarding the 1996 agreement, Middleton admits that it is unsigned[10] and purports to transfer rights to "Middleton, Inc., an Iowa corporation," a corporation that no longer existed in 1996. Nevertheless, Middleton contends that to discount the 1996 agreement on the basis of these flaws would, again, elevate form over substance. Middleton argues that, even though the 1996 agreement is unsigned, it demonstrates the intent of both companies to transfer the exclusive license in the '514 patent from Basic Coatings to Middleton for the purpose of bringing this lawsuit: "[The 1996 agreement] provides evidence of the intent of Basic Coatings and Middleton, Inc., both wholly owned by Lyle Middleton[,] to transfer rights from the former to the latter, and to allow Middleton to bring this suit, which it did." *See* Middleton Reply at 5 (docket no. 232). Middleton notes that Lyle Middleton was to sign the 1996 agreement on behalf of both companies. Middleton also adds, "Further, the assignment states that, 'at various times since 1990, with full knowledge and approval of Basic and the sole shareholder of both Basic and Middleton[,] Lyle Middleton, Middleton, when known as Perry–Austen, has held itself out as being the exclusive Licensee of such Licensor Patent Rights.'"[11] Middleton Reply at 5 (docket no. 232) (quoting the 1996 agreement).

In response, 3M argues that Basic Coatings never received an exclusive license in the '514 patent in 1992 and, moreover, that even if it had, Middleton has not provided evidence that Basic Coatings ever transferred its exclusive license to Middleton.

---

10. Middleton indicates that it searched for, but could not locate, a signed copy of the agreement.

11. Middleton, however, does not explain the legal significance of this provision of the unsigned 1996 agreement for its standing argument. Moreover, the facts that Middleton submitted to me in support of its summary judgment motion utterly contradict this provision. On November 16, 1992, Perry–Austen changed its name to Middleton, Inc., the Iowa corporation. Basic Coatings received its alleged license in the '514 patent from the Suiters on December 7, 1992. Thus, Perry–Austen no longer existed when Basic Coatings allegedly acquired its exclusive license in the '514 patent from the Suiters. Consequently, there is no way, based on the facts that Middleton has given me, that Middleton, *when known as Perry–Austen*, held itself out as possessing Basic Coatings' exclusive license in the '514 patent.

Therefore, I cannot see how this provision of the 1996 agreement, which contradicts the facts that Middleton has presented, supports Middleton's argument, and Middleton has not explained how it does.

As to the exclusive license allegedly granted to Basic Coatings in 1992, 3M argues that because Suitco, not the Suiters, owned the '514 patent on December 7, 1992, the Suiters themselves could not grant a license in the '514 patent. Furthermore, 3M asserts that the Suiter–Suitco agreement of December 7, 1992, which purported to authorize the license to Basic Coatings and join Suitco as a party to the Basic–Suiter agreement, failed to do so for two reasons. First, 3M argues that the Basic–Suiter agreement is fully integrated and thus triggers the parol evidence rule, such that extrinsic evidence, like the Suiter–Suitco agreement, may not be used to add to or contradict the meaning of the Basic–Suiter agreement. Second, 3M notes that the Basic–Suiter agreement contained a no-modification clause, which provided that the agreement could not be modified without the consent of both Basic Coatings and Suiter. 3M thus contends that, because Basic Coatings was not a party to the Suiter–Suitco agreement, the Suiter–Suitco agreement did not validly amend the Basic–Suiter agreement.

3M next argues that, even if the Suiters did grant an exclusive license to Basic Coatings, Middleton has not shown that Basic Coatings transferred that license to Middleton. 3M maintains that Middleton has provided no evidence that the 1996 agreement was ever executed, as it is unsigned. Moreover, 3M notes that the agreement, even if signed, would be invalid, as it purported to transfer rights to Middleton, Inc., an Iowa corporation, which did not exist as of December 31, 1994. For all these reasons, 3M concludes

that Middleton cannot base its standing on the 1992 Basic–Suiter agreement.

#### b. Analysis

To begin, I note that, even assuming that Middleton is correct that Basic Coatings did receive an exclusive field-of-use license in the '514 patent, Basic Coatings's license is irrelevant to Middleton's standing if Basic Coatings never transferred its rights to Middleton. Thus, I first address this basic issue of whether Middleton has shown that Basic Coatings assigned its purported exclusive license in the '514 patent to Middleton.

Under Iowa law, a contract is not valid unless "the parties ... express mutual assent to the terms of the contract." *See Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002).[12] There is no indication of mutual assent here, as Middleton has supplied only the unsigned 1996 agreement as proof that Basic Coatings and Middleton agreed to transfer the exclusive license in the '514 patent. Although Middleton claims that "it is indisputable that the 1996 assignment was drafted to be signed by Lyle Middleton on behalf of both Basic Coatings and Middleton," Middleton Reply at 5 (docket no. 232), the fact that it was drafted to be signed by the companies, without more, says nothing about whether the companies actually agreed that Basic Coatings would assign the license to Middleton. Middleton has provided no information as to who drafted the contract or whether Lyle Middleton ever saw the draft. Moreover, the 1996 agreement does not even refer to the plaintiff Middleton, the Florida corporation, but rather to Mid-

12. I apply Iowa law in interpreting the 1996 agreement. The agreement does not include a choice of law provision, and neither party has briefed which state's law I should use to interpret it. 3M cites no cases in support of its position that the 1996 agreement is invalid, and Middleton cites Iowa cases to argue

the 1996 agreement sufficiently demonstrates the party's intent to form a contract. Because Middleton appears to believe that Iowa law applies to this contract, and 3M has offered no argument to the contrary, I apply Iowa law.

dleton, Inc., the dissolved Iowa corporation, rendering even more tenuous Middleton's argument that the 1996 agreement establishes the intent of Basic Coatings to assign its license to the plaintiff Middleton.

Of course, the transfer of a patent license need not be in writing. *See Waymark*, 334 F.3d at 1364. However, other than the unsigned 1996 agreement, Middleton has produced no evidence, such as an affidavit from someone familiar with the companies, of an agreement, either oral or written, between Basic Coatings and Middleton regarding the '514 patent license. Beyond the 1996 agreement, the only evidence to which Middleton directs me to prove that the license assignment from Basic Coatings to Middleton did, in fact, occur is that Middleton filed this lawsuit:

> Middleton searched for, but could not locate, a signed version of the 1996 assignment, which is hardly surprising after 15 years of litigation without any mention of the standing issue. However, the version that was located provides evidence of the intent of Basic Coatings and Middleton, Inc., both wholly owned by Lyle Middleton[,] to transfer rights from the former to the latter, and to allow Middleton to bring this suit, which it did. This evidence is sufficient to overcome this last remaining challenge to Middleton's standing.

Middleton Reply at 5 (docket no. 232). Middleton's argument boils down to, the conjecture that, because Middleton filed this lawsuit, it must have acquired the exclusive license from Basic Coatings at some point. Filing a lawsuit does not establish that a party has standing, *see Elk Grove*, 542 U.S. at 12, 124 S.Ct. 2301 (stating requirements for standing), and, thus, the fact that Middleton filed this lawsuit does nothing to bolster its argument that it acquired Basic Coatings's license in the '514 patent.

Additionally, Middleton asserts that 3M's objection to the validity of the 1996 agreement ignores the close relationship between Basic Coatings and Middleton— Lyle Middleton was the sole shareholder and president of both, and, as the 1996 agreement shows, he was to sign on behalf of both companies. Middleton argues, consequently, that to find that Middleton does not have standing would elevate form over substance, when both companies were owned by the same individual. Contrary to Middleton's position, however, the Federal Circuit Court of Appeals recently rejected the notion that a company can possess an exclusive license in a patent, merely by dint of being affiliated with a company with actual rights in the patent. *See Spine Solutions*, 620 F.3d at 1318 (finding that, where "there [wa]s no agreement, either oral or written, between SSI [patent owner] and Synthes Spine [its sister corporation] with respect to the '071 patent," but rather "an 'understanding' ... within the Synthes family that Synthes Spine has the exclusive right to practice the '071 patent," Synthes Spine, the sister corporation, did not have exclusive licensee standing). To find otherwise, explained the court, "would mean that any company related to a patent owner could be treated as an exclusive licensee, so long as the patent owner allows only that company to practice the patent, regardless of any actual agreement as to exclusivity." *Id.*

The Federal Circuit Court of Appeals's adherence to corporate formalities is nothing new—it has adamantly declared that parties who incorporate "may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure." *See Poly–America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303, 1311 (Fed.Cir.2004) (explaining that parties must "take the benefits with the burdens"

of corporate formation, such that where a parent company created two separate corporations, one that owned a patent and one that sold the patented product, the company that owned the patent could claim only its own lost profits in a patent infringement case, not those of its sister corporation that sold the product); *see also Abraxis Bioscience,* 625 F.3d at 1365 (concluding that the plaintiff had no rights in the patents at issue and, consequently, no standing, where it entered into a patent assignment agreement with Astra–Zeneca UK, while Astra–Zeneca UK's corporate affiliates, not Astra–Zeneca UK, owned the patents).

For whatever reasons or benefits, Basic Coatings and Middleton are separate corporations. The mere fact that the two companies had the same president and sole shareholder does not make them the same entity for purposes of patent rights. Therefore, the close relationship between Basic Coatings and Middleton does not salvage Middleton's first theory of standing.

Thus, in presenting its first theory of standing, Middleton has not shown that Basic Coatings transferred its purported license in the '514 patent to Middleton. Consequently, I do not reach the issue of whether Basic Coatings did, in fact, receive an exclusive license in the '514 patent from the Suiters and Suitco. Thus, as to its first theory of standing, Middleton has not met its burden, as the summary judgment movant, to direct me to evidence that would support summary judgment in its favor. Moreover, Middleton has not carried its burden to establish standing, as it has not presented me with any evidence under which I could find that it acquired an exclusive license in the '514 patent from Basic Coatings. Therefore, Middleton's first theory of standing fails.

### 2. Standing based on the 1987 agreement

#### a. Arguments of the parties

Alternatively, Middleton asserts that it has standing, as the successor-in-interest to Perry–Austen, because the 1987 agreement between the Suiters and Perry–Austen granted Perry–Austen an exclusive license in the '514 patent. Middleton argues that if 3M is correct that the 1992 Basic–Suiter agreement was ineffective in granting an exclusive license in the '514 patent to Basic Coatings, then the Basic–Suiter agreement was also ineffective in terminating the 1987 agreement between the Suiters and Perry–Austen. Consequently, Middleton argues that the 1987 agreement, and the rights granted to Perry–Austen pursuant to that agreement, are still valid and effective. The "Licensor Patent Rights" in the 1987 agreement include:

(1) Patent Application Serial No. 871,-318 filed June 6, 1986 and entitled "Bowling Lane Refinishing Apparatus and Method";

(2) Patent Application Serial No. 940,-428, filed December 11, 1986 and entitled "Bowling Lane Refinishing Apparatus";

(3) Any other United States Letters Patent owned by Suiter or under which Suiter now has or at any time in the future [*sic* ] may have the right to grant licenses which are related to the foregoing; and

(4) any divisions, reisues [*sic* ], continuations-in-part and extensions of the foregoing now owned by Suiter or under which Suiter now has the right to grant licenses or for which Suiter has an application for patent rights pending.

Middleton Appendix at 10. Middleton argues that "[t]he Licensor Patent Rights were defined to include the '318 and '428 applications, as well as any 'divisions, reis-

sues, continuations-in-part and extensions of such applications.' " Middleton Brief at 2 (docket no. 221–1). Thus, Middleton contends that the "Licensor Patent Rights" include the '514 patent, and the '863 application from which it matured, because they were a continuation in part of the '428 application and a continuation in part of the '617 application, which, in turn, was a continuation of the '318 application. Finally, Middleton maintains that the 1992 amendment to the 1987 agreement, which specifically named the '514 patent as included in the "Licensor Patent Rights," served to identify patent rights already included in the original 1987 agreement, rather than adding additional patent rights.

In opposition, 3M first argues that the 1992 Basic–Suiter agreement did, indeed, terminate the 1987 agreement. 3M contends that, although the Basic–Suiter agreement did not transfer any rights in the '514 patent, it was an otherwise valid contract and apparently did effectively transfer patent rights other than the '514 patent that the Suiters, rather than Suitco, owned. 3M notes that the Basic–Suiter agreement contains a severability clause, providing that "[i]f any part ... of this Agreement is declared invalid ..., the remaining parts ... shall remain in full force and effect...." Middleton Appendix at 28. Thus, 3M concludes that even though the provision of the agreement that granted Basic Coatings an exclusive license in the '514 patent was ineffective, the rest of the agreement, including the provision that terminated the 1987 agreement, as amended in 1992, is valid.

Next, 3M argues that even if the Basic–Suiter agreement did not terminate the 1987 agreement, neither the original 1987 agreement, nor its amended version in 1992, actually granted Perry–Austen any rights in the '514 patent or the '863 application. 3M notes that the "Licensor Patent Rights" include "any divisions, reissues, continuations-in-part and extension of the foregoing *now* owned by Suiter or under which Suiter *now* has the right to grant licenses or for which Suiter has an application for patent rights *pending*." Middleton Appendix at 10 (emphasis added). 3M maintains that "this section was limited to patents and pending applications that were owned by Mr. Suiter as of November 6, 1987," the date the 1987 agreement was executed. 3M Opposition at 16 (docket no. 16). 3M concludes, therefore, that this section includes neither the '514 patent, because the '514 patent did not issue until 1990, nor the '863 application, because Suiter did not file the '863 application until December 13, 1998.[13]

Finally, 3M contends that the 1992 agreement did not add the '514 patent to the "Licensor Patent Rights" because Suitco, not the Suiters, owned the '514 patent when the 1992 amendment was executed. Therefore, 3M argues that because Suitco

---

**13.** 3M also urges that section (3) of the "Licensor Patent Rights," which includes "[a]ny other United States Letters Patent owned by Suiter or under which Suiter now has or at any time in the future [*sic*] may have the right to grant licenses which are related to the foregoing," Middleton Appendix at 10, does not cover the '514 patent. 3M contends that the '514 patent does not qualify as a "Patent now owned by Suiter," as of November 6, 1987, because it did not issue until 1990. 3M also asserts that the '514 patent likewise does not qualify as a "Patent ... under which

Suiter now has or at any time in the future [*sic*] may have the right to grant licenses which are related to the foregoing," because Suiter assigned all rights in the '863 application to Suitco before the '514 patent ever issued. Thus, 3M concludes Suiter never had the right to grant licenses under the '514 patent. I agree with 3M's reasoning. In any event, however, Middleton has not raised section (3) as a basis for standing or countered 3M's arguments. Thus, I do not consider in more detail whether section (3) supports Middleton's standing to maintain this action.

was not a party to the 1992 amendment, the 1992 amendment did not grant any license in the '514 patent.

In its reply brief to 3M's opposition, Middleton explains in more detail how the 1987 agreement includes the '863 application. Middleton contends that, unlike "any divisions, reisues, continuations-in-part and extensions of the foregoing *now* owned by Suiter or under which Suiter *now* has the right to grant licenses," "any divisions, reisues, continuations-in-part of the foregoing ... for which Suiter has an application for patent rights pending" does not include the word "now" and thus would include *future* "application[s] for patent rights pending." Middleton argues that applications for patent rights in existence at the time of the execution of the 1987 agreement would already be included under the 1987 agreement as "any divisions, reisues, continuations-in-part and extensions of the foregoing *now* owned by Suiter or under which Suiter *now* has the right to grant licenses." Thus, Middleton argues that "application[s] for patent rights pending" would be an unnecessary addition to the contract, unless it was intended to cover future applications. Middleton concludes, therefore, that even though Suiter filed the '863 application after the execution of the 1987 agreement, the 1987 agreement also covers the '863 application as a future application for patent rights.

### b. Analysis

 Even if Middleton is somehow correct that the Basic–Suiter agreement did not terminate the 1987 agreement, neither the original 1987 agreement, nor its amended 1992 version, granted Perry–Austen an exclusive license in the '514 patent.

 To ascertain whether a party possesses an exclusive license in a patent, I look to the language of the licensing agreement itself to determine the intent of the patent licensor and licensee. *See Textile Prods.*, 134 F.3d at 1484; *Rite–Hite,* 56 F.3d at 1552. It is clear that the 1987 agreement granted Perry–Austen an exclusive license in the '318 and '428 applications. Moreover, Middleton is certainly right that the '514 patent, and the '863 application from which it matured, are a continuation-in-part of the '428 application and a continuation-in-part of the '617 application, which, in turn, is a continuation of the '318 application. Importantly, however, the 1987 agreement did not grant Perry–Austen a blanket exclusive license in *all* "divisions, reisues [*sic*], continuations-in-part and extensions" of the '318 and '428 applications. Rather, the plain language of the 1987 agreement makes clear that the Suiters granted Perry–Austen an exclusive license in "any divisions, reisues [*sic*], continuations-in-part and extensions of the ['428 and '318 applications] *now* owned by Suiter or under which Suiter *now* has the right to grant licenses or for which Suiter has an application for patent rights *pending*." Middleton Appendix at 10 (emphasis added). When the Suiters and Perry–Austen executed the 1987 agreement, the '514 patent was not "now owned by Suiter," nor did "Suiter now ha[ve] the right to grant licenses" in the '514 patent, as the '514 patent did not issue until 1990. Thus, the 1987 agreement does not include the '514 patent.

Regarding the '863 application, Middleton urges a strained interpretation of the phrase "for which Suiter has an application for patent rights pending." Although "for which Suiter has an application for patent rights pending" does not include "now," the temporal limitation in the phrase comes from "pending," which, plainly read, refers to patent applications *pending* at the time the agreement was executed, not future applications. Middleton misreads the contract when it argues that "or for which Suiter has an application for patent

rights pending" would be an unnecessary addition to the contract unless interpreted to include future applications. Middleton argues that "any divisions, reissues [*sic* ], continuations-in-part and extensions of the ['428 and '318 applications] now owned by Suiter or under which Suiter now has the right to grant licenses" includes pending patent applications. Although the Federal Circuit Court of Appeals uses the terminology "continuation-in-part" to refer to both issued patents and patent applications, depending on the context, *see, e.g., Cordance Corp. v. Amazon.com, Inc.,* 658 F.3d 1330, 1333 (Fed.Cir.2011) (referring to an issued patent as a "continuation-in-part"); *Retractable Techs., Inc. v. Becton, Dickinson & Co.,* 653 F.3d 1296, 1299 (Fed.Cir.2011) (referring to patent applications as "continuation-in-part applications"), it is apparent from the context of the entire contract clause here, however, that "any divisions, reissues [*sic* ], continuations-in-part and extensions of the ['428 and '318 applications]" refers to issued patents, not pending applications.

The entire contract clause reads: "any divisions, reissues, continuations-in-part and extensions of the ['428 and '318 applications] now owned by Suiter or under which Suiter now has the right to grant licenses or for which Suiter has an application for patent rights pending." Thus, "or for which Suiter has an application for patent rights pending" adds an additional bundle of rights to the clause, as it gives Perry–Austen an exclusive license not only in "any divisions, reissues, continuations-in-part and extensions of the ['428 and '318 applications] now owned by Suiter or under which Suiter now has the right to grant licenses," but also an exclusive license in "any divisions, reissues [*sic* ], continuations-in-part and extensions of the ['428 and '318 applications] ... for which Suiter has an application for patent rights pending." Therefore, it is clear that the 1987 agreement does not include future

applications for patent rights, only pending applications. Suiter did not file the '863 application until 1988, and, thus, it was not "an application for patent rights pending" when the 1987 agreement was executed.

Finally, the 1992 amendment succeeded neither in identifying the '514 patent as one in which Perry–Austen already possessed an exclusive license nor in adding it to the Licensor Patent Rights in the 1987 agreement. First, the 1992 amendment could not have identified the '514 patent as already included in the 1987 agreement because, as explained above, the 1987 agreement did not grant Perry–Austen any rights in the '514 patent. Second, the 1992 amendment could not have operated to add the '514 patent to the 1987 agreement. When Perry–Austen and the Suiters executed the 1992 amendment, Suitco, not the Suiters, owned the '514 patent. Thus, the Suiters, as individuals, could not grant licenses in the '514 patent. *See Prima Tek II,* 222 F.3d at 1382 ("[A]n owner or licensee of a patent cannot convey that which it does not possess."); *see also Abraxis Bioscience,* 625 F.3d at 1365. While this conclusion may seem pedantic or overly formalistic (Suitco was James Suiter's company, after all), as explained above, a party "may not enjoy the advantages of [its] ... corporate structure and, at the same time, avoid the consequential limitations of that structure." *See Poly–America,* 383 F.3d at 1311; *see also Spine Solutions,* 620 F.3d at 1318. Suitco, not the Suiters as individuals, was the entity with authority to grant licenses in the '514 patent. Thus, the 1992 amendment neither identified the '514 patent as included in the original 1987 license nor added it to the existing license.

In sum, neither the original 1987 agreement, nor its amended 1992 version, granted Perry–Austen rights in the '514 patent. Consequently, even if the Basic–Suiter

agreement did not terminate the 1987 agreement, the 1987 agreement does nothing to establish that Perry–Austen and, more importantly, its successor-in-interest, Middleton, ever possessed an exclusive license in the '514 patent. Therefore, as to its second theory of standing, Middleton has failed to meet its burden, as the summary judgment movant, to present me with evidence that supports summary judgment in its favor. Additionally, Middleton has not carried its burden to establish standing, as it has not provided any evidence that it holds an exclusive license in the '514 patent through its predecessor Perry–Austen. Middleton's second theory of standing fails.

### III. CONCLUSION

Middleton has had the opportunity to provide me with any evidence that would establish its standing to maintain this action. Examining all the evidence before me, I cannot find any basis for Middleton's standing. Consequently, Middleton's Motion For Summary Judgment That It Has Standing To Maintain This Action is denied, and I also must dismiss this case for lack of standing. *See* FED.R.CIV.P. 12(h)(3).

3M has requested dismissal with prejudice but cites no case law to bolster its position. On the issue of whether dismissal for lack of standing should be with or without prejudice, the Federal Circuit Court of Appeals follows regional circuit law. *See University of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1332 (Fed.Cir.2009). The Eighth Circuit Court of Appeals has explained that because dismissal for lack of standing is based "solely on jurisdictional grounds," rather than on the merits of the case, dismissal with prejudice is inappropriate. *See County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464–65 (8th Cir.2004). Thus, dismissal without prejudice is proper in this case.

THEREFORE, Middleton's Motion For Summary Judgment That It Has Standing To Maintain This Action (docket no. 221) is **denied.** Pursuant to Federal Rule of Civil Procedure 12(h)(3), this case is **dismissed without prejudice** for lack of standing. The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**